[No. 7671. Decided November 23, 1908.]

## L. S. GREEN, *Respondent*, v. THE CITY OF BALLARD, *Appellant*.[1]

CONTRACTS—CONSTRUCTION—FOR SINKING WELL—TEST OF CAPACITY—PERFORMANCE. In a contract for sinking city wells, agreed to produce 1,500,000 gallons per day for a period of fourteen months, a clause providing that, after a certain payment upon obtaining a supply of 800,000 gallons a day, the contractor shall be paid the balance when successful in obtaining a supply equal to 1,500,000 gallons per day of twenty-four hours, "when tests are made and work accepted by the city council," requires that the character of the well for the entire period must be ascertained by test, and upon a successful test made by authority of the council for six days, the contractor is entitled to the full contract price before the expiration of the fourteen months.

Appeal from a judgment of the superior court for King county, Griffin, J., entered April 14, 1908, upon findings in favor of the plaintiff, after a trial before the court without a jury, in an action on contract. Affirmed.

*Scott Calhoun* and *H. D. Hughes*, for appellant.

*Jay C. Allen*, for respondent.

RUDKIN, J.—This action was instituted to recover the contract price for sinking a well, under the following agreement entered into between the plaintiff and the defendant city:

"This contract made on this 12 day of February, 1906, between the city of Ballard, a municipal corporation of the state of Washington, party of the first part, and L. S. Green of the city of Seattle, party of the second part;

"Witnesseth: That for and in consideration of the promise and stipulations hereinafter made, and in consideration of the payments hereinafter specified, it is agreed between the parties hereto:

"(1) The party of the second part promises and agrees with the party of the first part, to sink wells at such places

[1] Reported in 98 Pac. 95.

upon the public streets or alleys of the party of the first part as the party of the second part may select, and pipe the water obtained from such wells underground to a point at or near the present pumping station of the party of the first part, and to conduct all such wells to a main suction pipe, and lead the water supply to a pit at or near said pumping station, so that said wells when completed and properly pumped will furnish one million five hundred thousand (1,500,000) gallons of water per day of twenty-four hours, the water to be of a quality similar to that of the water now obtained from the artesian well of the Ballard Lumber Company in the city of Ballard, and similar to that of the good wells of the city of Ballard. The party of the second part agrees that the wells so to be sunk by him, will furnish a supply of water of such quality equal to eight hundred thousand gallons per day of twenty-four hours at said point when properly pumped within ninety (90) days after the date of this contract; the ninety (90) days to be ninety (90) full working days, and not to include any holidays, or days when the weather or elements are such as not to permit the party of the second part to work, or any delays on account of strikes. All the materials, casing and piping used in the drilling and piping of said wells is to be furnished by the party of the second part at his own expense. Said work and said materials to be in all respects in accordance with the specifications now on file in the office of the clerk of the city of Ballard, which are hereby referred to and made a part of this contract.

"(2) The party of the second part shall have the right in piping the said water from said wells to the point above referred to, to go along and upon any street or alley of the said city of Ballard, and shall lay said pipe or pipes along said streets or alleys, and underneath or below the surface thereof.

"(3) The party of the first part is to furnish to the party of the second part free of charge, all water necessary to be used by him in doing said work.

"(4) The party of the second part guarantees water of the quality similar to that furnished by the artesian well of the Ballard Lumber Company, and of the good wells of the city of Ballard.

"(5) Should the said party of the second part be successful in sinking or drilling wells, which will furnish, when

properly pumped, one million five hundred thousand (1,-500,000) gallons of water, of the quality above referred to, per day of twenty-four hours, as proved by test, party of the first part agrees to pay him therefor at the rate of two cents (2c) per one hundred (100) cubic feet for all the water which said wells are capable of furnishing, for a period of fourteen (14) months (not exceeding one million five hundred thousand (1,500,000) gallons per day). Should, however, the party of the second part succeed in obtaining a supply of at least eight hundred thousand (800,000) gallons of water of such quality per day of twenty-four hours only from the said wells, when properly pumped, within a period of ninety (90) days, from the date of this contract, said days to be computed as above set forth, then the party of the first part is to pay the party of the second part therefor, immediately after test and acceptance of work by the city council has been made, a sum equal to seventy-five per cent (75 per cent) of the amount due for eight hundred thousand (800,000) gallons as proved by test, for a period of fourteen months (14) figured at the rate of two cents (2c) per one hundred cubic feet. The party of the second part is to proceed with said work, however, in an endeavor to increase said supply to at least one million five hundred thousand (1,500,-000) gallons of water per day of twenty-four (24) hours, and when he shall be successful in obtaining a supply of water of such quality equal to one million five hundred thousand (1,500,000) gallons per day of twenty-four (24) hours, then the balance of the contract price, to wit: the balance of the amount due for said eight hundred thousand (800,-000) gallons, and the amount due for the remaining seven hundred thousand (700,000) gallons for the period of fourteen (14) months, at the rate of two (2c) cents per one hundred cubic feet, shall be paid to the party of the second part, or to his order when tests are made and work accepted by the city council.

"(6)   The party of the first part agrees to, and it shall provide and maintain a fund, to be known as the 'Water Extension Fund' into which there shall be paid forty per cent (40 per cent) of the gross revenues received by the party of the first part from sales of water, and water rentals, and shall keep said fund intact and irreducible, until the warrants or bonds hereinafter referred to are fully paid and discharged.

"(7)   The payment for the work aforesaid shall be made to the party of the second part in warrants or bonds, drawn by the party of the first part, payable to the order of the party of the second part, on and out of said 'Water Extension Fund,' to be so provided and maintained as hereinbefore agreed, said warrant or bond shall draw interest from their date until paid at the rate of eight per cent (8 per cent) per annum.

"(8)   The party of the second part is to furnish the party of the first part a good and sufficient bond, with two or more sureties, or with a surety company as surety, in the penal sum of seven thousand five hundred ($7,500.00) dollars, conditioned that the party of the second part shall pay all claims for damages growing out of the doing of said work, or because thereof, all laborers, mechanics and subcontractors and material men, and all persons who shall supply such person or persons, or subcontractors with the provisions and supplies for carrying out said work.

"(9)   Should the wells be sunk by the party of the second part under this contract, fail, when properly pumped to furnish a supply of at least eight hundred thousand (800,-000) gallons of water per day of twenty-four (24) hours, of the quality hereinbefore mentioned, within ninety (90) days from the date of this contract, said ninety (90) days to be computed as hereinbefore mentioned, the party of the second part is to receive no compensation, and should the wells fail to produce the remaining seven hundred thousand (700,-000) gallons when properly pumped, according to the same conditions, the party of the second part is to receive no compensation for said seven hundred thousand (700,000) gallons and forfeit the twenty-five per cent (25 per cent) of payment due for said eight hundred thousand gallons (800,-000)."

The court below found the issues in favor of the plaintiff, and gave judgment for the full contract price for sinking a well with a daily capacity of 1,500,000 gallons, less certain offsets not deemed material here.   From this judgment the defendant has appealed.

The case turns largely upon the construction of the above contract, and the effect to be given a certain test made by

the appellant or under its supervision. It is admitted that the respondent sank a well with a daily capacity of 800,000 gallons, and that he has been paid the full contract price therefor. The respondent contends that the well had the further capacity of 1,500,000 gallons per day, but this claim is denied by the appellant. The well was completed to its present capacity some time prior to the 25th day of May, 1906, and on that day the city council of the appellant city adopted the following resolution:

"In regard to the testing of the well, it was moved and carried that two special police be appointed by the mayor to remain at the well alternating for a period of six days and nights to see that the pump runs at the same speed at all times, day and night, and that the water be measured each hour of the 24 and a record kept, the test beginning this, Friday, morning, and continuing until Wednesday night of next week. The mayor appointed Matt Locke and Michael Nelson as such special police."

The test provided for commenced on the date specified in the resolution, but after a run of about four days the engine broke down and the test was abandoned until a larger engine could be installed. After the old engine was replaced by the new or different one, the six days' test was resumed and completed, under the supervision of two special officers appointed by the mayor. The officers thus appointed reported the result of the test to the city council of the appellant city, and under date of June 26, 1906, the following entry appears in the minutes of that body: "Report of Matt Locke and Antone Anderson on the test of the new city well showing an average for the six days' test of one minute and 25 5-6 seconds for filling the tank holding ————. Ordered placed on file."

It was admitted at the trial that the tank referred to in the foregoing report had a capacity of 1,472 gallons, and the report shows, therefore, that the daily capacity of the well exceeded the 1,500,000 gallons called for by the contract. The appellant earnestly insists that it contracted for a water

supply of 1,500,000 gallons per day for a period of fourteen months, and that the proof shows that no such supply was furnished for that period. We agree with counsel that the city contracted for the supply agreed upon for the period of fourteen months, and also that the proof fails to show that such supply was in fact furnished for that period. This would preclude a recovery on the part of the respondent, unless the contract itself provides how the capacity of the well shall be ascertained, and such capacity was ascertained in the manner thus provided.

We are constrained to hold that the contract does contain such a provision. A portion of paragraph 5 reads as follows:

"The party of the second part is to proceed with said work, however, in an endeavor to increase said supply to at least one_ million, five hundred thousand (1,500,000) gallons of water per day of twenty-four (24) hours, *and when he shall be successful in obtaining a supply of water of such quality equal to one million five hundred thousand (1,500,-000) gallons per day of twenty-four (24) hours, then the balance of the contract price, to wit: the balance of the amount due for said eight hundred thousand (800,000) gallons, and the amount due for the remaining seven hundred thousand (700,000) gallons for the period of fourteen (14) months, at the rate of two (2c) per one hundred cubic feet, shall be paid to the party of the second part, or to his order when tests are made and work accepted by the City Council.*"

This provision shows clearly that the capacity of the well for the entire period covered by the contract was to be ascertained by test, and that the contractor was to be paid in full for his work long before the expiration of the fourteen months. In other words, it was agreed between the parties that the capacity of the well for all the purposes of the contract should be ascertained by test as soon as the respondent was successful in obtaining a supply of water equal to 1,500,000 gallons per day of 24 hours, and that he should be entitled to the balance due under the contract at that time.

We are aware that under this construction of the contract the appellant took chances on the supply holding out for the full period of 14 months, but in our opinion no other construction will give full effect to all the provisions of the contract, which are somewhat conflicting. It follows from what we have said that the test made by the appellant established the capacity of the well within the meaning of the contract, and that test entitled the respondent to the full compensation provided for in the contract. Such having been the conclusion of the court below its judgment is affirmed.

DUNBAR, ROOT, MOUNT, and FULLERTON, JJ., concur.

HADLEY, C. J., and CROW, J., took no part.